## SCOTT v. INLAND WATERWAYS CORPORATION.

### FARGO et al. v. SAME.
### Nos. 287, 291.

District Court, E. D. Louisiana. ·
Sept. 19, 1938.

Edouard F. Henriques, of New Orleans, La., for libelants.

Lucien Y. Ray, Sp. Atty. in Admiralty, and William I. Connelly, Atty., U. S. Maritime Commission, both of New Orleans, La., for respondent.

BORAH, District Judge.

These two consolidated libels are brought against The Inland Waterways Corporation, owner of the steamer St. Louis, to recover damages for the death of two negroes who were drowned in the Mississippi river above the harbor limits of the city of New Orleans on the night of August 27, 1936. In the first numbered cause the widow of Captain Stewart is suing on her own behalf and as natural tutrix of the eight minor children; in the other cause libelants allege that they are the sisters and nearest of kin of Edward Fargo. The right to sue, and in these respective capacities, is based upon Article 2315 of the Revised Civil Code of Louisiana, as amended, which reads in part as follows:

"Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it; the right of this action shall survive in case of death in favor of the children, including adopted children, or spouse of the deceased, or either of them, and in default of these in favor of the surviving father and mother or either of them, and in default of any of the above persons, then in favor of the surviving brothers and sisters, or either of them, for the space of one year from the death; provided that should the deceased leaving a surviving spouse, together with minor children, the right of action shall accrue to both the surviving spouse and minor children; provided further, that the right of action shall accrue to the major children only in those cases where there is no surviving spouse or minor child or children. * * *

"The survivors above mentioned may also recover the damages sustained by them by the death of the parent or child or husband or wife or brothers or sisters or adoptive parent, or parents, or adopted person, as the case may be."

The libels charge that on the evening of the day in question Captain Stewart and Edward Fargo were fishing from a small skiff which was anchored in the Mississippi river near the shore of the west bank a short distance above Nine Mile Point and about one mile below the Mississippi River Bridge; that they were fishing in a place frequently and commonly used by fishermen at night, were exposing a lighted lantern in their skiff, and that fishermen in two other anchored skiffs in line with and above them were also exhibiting lighted lanterns. That at this time, which was somewhere between the hours of nine and ten o'clock the steamer St. Louis with a tow of barges rounded Nine Mile Point and proceeded upstream on a course in the path of said skiffs and either ignoring the lights therein or because of the absence of a proper lookout, ran down and drowned the two occupants of the skiff that was farthest downstream.

For answer respondent denies that any negligent act on its part caused or contributed to the accident, denies that the

tow of the steamer St. Louis collided with the skiff, denies that the law imposed any obligation on the steamer to keep out of the way of skiffs and to have a lookout stationed at the head of the tow, or that his presence there would have averted a collision. In the alternative, and only in the event of an adverse determination of these questions, respondent pleads by way of special defense that said collision resulted solely from the negligent acts and omissions of deceased in that their indifference to their own safety and want of care in the management of the skiff were the proximate cause of the resultant loss of life.

█ On the day of the trial respondent filed a special plea in No. 291 praying that the libel of Norma and Amelia Fargo be dismissed on the ground that they had failed to allege and prove that they were the legitimate sisters of the deceased by reason of whose death they allege that they have sustained injury and are entitled to recover under Article 2315, supra. The merits of this plea are not seriously controverted and it could not very well be otherwise for there is not a single certificate or· authenticated document in this record to establish the status of these libelants. As a matter of fact their parents are not even mentioned in the testimony and the libel does not allege that they are the legitimate sisters of the deceased. The only witness offered to sustain the allegations of the libel as to the relationship of libelants to the deceased was Norma Fargo and her testimony relative to her alleged brother was contradicted in several important particulars by the testimony of other witnesses of at least equal credulity. Amelia Fargo was not called as a witness; she did not even answer the interrogatories which were addressed to her. The record shows that she affixed her mark to the affidavit which is annexed to the libel, and that is the limited extent of her appearance in this case. Such being the state of the record it follows that the plea interposed by respondent is well founded in law and in fact and that the libel should be dismissed. The merits of the remaining libel will now be considered.

. The St. Louis is a single screw towboat measuring 200 feet in length, 40 feet in width and 7.5 feet in depth. On the voyage in controversy ˙she was pushing six barges which were arranged in three tiers or three abreast; two barges were on the face of the towboat, three barges were on the starboard side, the˙lead barge extending ahead of the center tier and one barge was on the port side with its stern even with the face of the boat. It appears from the evidence that the distance from the head of the middle tier of barges to the front windows of the pilot house was 495 feet; that the housing on the middle tier of barges was about 18 feet above water level; that the pilot house floor was 25 feet above the water line; and that a blind spot of several hundred feet extended· ahead of those barges.

The undisputed evidence in this case shows that the steamer St. Louis, northbound with six barges in tow, left the Upper Fleet in the vicinity of Nashville Avenue and the river at 7:45 P. M. and proceeded upstream to Baton Rouge passing Fairfield Light at 9 P. M. Fairfield Light is 1.1 miles upstream from the main span of the Mississippi River Bridge, 2.3 miles upstream from Southport Light, 2.4 miles upstream from Nine Mile Point Light and is approximately 5½ miles from the point of departure.

According to respondent's witnesses the voyage upstream was entirely without incident and no one on the steamer saw any skiffs or lights on the water or heard any crash or outcry in the vicinity of the Point. Indeed the first intimation they had of this unfortunate occurrence was months later when the present suit was filed. Their testimony is also to the effect that the St. Louis was navigated skillfully and that she "ran the ranges" that night in the customary manner. Captain Menard, who was then at the wheel, stated that he came up under Nine Mile Point favoring the middle of the river and after clearing the Point and when abreast of Southport Light he shaped his course to pass through the main channel span of the bridge by bringing the tow around into such position that when looking over the stern Southport Light showed in the range over the jack staff aft and Fairfield Light ahead showed over the forward jack staff. The captain testified that he used his search light on approaching Nine Mile Point for the benefit of descending traffic, that when abreast of the Point he used ,it again to get a view of the bridge and that before passing through the bridge he used it again and maybe twice to ascertain if anything was on the surface of the water.

Libelants' case is predicated on the testimony of three witnesses who claim that they were fishing in the river at the time of the accident. Eugene Landry testified that he and his brother Wallace were anchored 30 or 40 feet from shore at a point 1½ miles below the bridge, that Wilson was upstream a block or more and that Stewart and Fargo were anchored at about the same distance downstream. He says they moved because a boat was headed towards them but would give no estimate of how·far away the boat was when he first saw it. He says that he raised his lantern at a time when the tow-boat 1½ blocks away was using its search light towards the bank. It is his version that the collision occurred almost immediately after the decedents called out "Hey, hey, hey"; however, he admits that at no time after he saw the boat coming did he have occasion to look at decedents. Consistent with his story that he did not see the skiff or its occupants after seeing the boat the witness further stated that when he started to row for shore he was facing in their direction but he was watching the boat all along. At another point in his examination he said that he could not see what position the decedents occupied in the skiff but that the light was sitting on the back seat. He further stated that he saw the front barge on the end towards the bank strike them; that three minutes after he got to the bank the boat passed him 35 or 40 feet away; that it was going faster than 10 or 12 miles per hour but he could not identify it save that it was shoving a number of barges.

Wallace Landry agrees with his brother that all three skiffs were fishing on a line 30 or 35 feet off the bank but he says that Stewart and Fargo were sitting in opposite ends of the skiff with a light on the middle seat. He says the boat was turning the curve when he first saw it and he could see the red and green lights; that later he saw the towboat throw its search light but it passed over their heads. In his estimation he was fishing at least one mile from the bridge. On direct examination he stated that the barge nearest the shore struck decedents. On cross examination he stated that when the barge hit them he was coming ashore and that he does not know whether he was looking at them or not. Nor did he notice any barge tied up anywhere near the boat itself as it went past.

The testimony of Joseph Wilson is in accord with that of the two previous witnesses relative to the positions of the three skiffs. During the course of his examination he stated that he loaned a lantern to decedents and that same was lit at the time of the accident. Upon being asked what happened to them he said that "they were baiting their lines down in the skiff by one lantern * * * and the boat crawled up and hit them". This was evidently only his opinion for in his next answer he admitted that he did not notice the boat that ran them down and later he testified that he did not see decedents at the time they were hit. That he last saw them at 7:30 P. M. when he passed them going up the river and they were then both sitting on the rear seat of the skiff and their light was also on said seat. That he also saw the lantern in Landrys' skiff when he passed them and he saw it again that night after the accident when they were crossing the river ahead of him. He testified that he first saw the vessel on the New Orleans side of the river at the time it turned at Nine Mile Point; that when she came around the Point and straightened up she began using her search light on the bridge. ` Like the two preceding witnesses he could not identify the vessel and he had no idea of `the makeup of the tow.

From the foregoing analysis of libelants' testimony it is apparent that no witnesses saw the accident or were able to identify the St. Louis by name or description as the boat which passed at the time these men were drowned. However, these witnesses do claim to have heard the men downstream call out and they all agree that the collision occurred within 30 to 40 feet of the shore. This claim is obviously based on assumption and not facts. If their story in this particular is to be believed then it follows that respondent's testimony relative to the course of the towboat must be disregarded in its entirety and `the conclusion reached that despite all the evidence the tow was out of shape and in trouble. In my judgment the probabilities arising from this situation do not favor the view that an experienced master would, under the circumstances here disclosed,. steer a course in such close proximity to the west bank when he had 2,500 feet of unobstructed river in which to navigate. If he was ever that close to the bank it is most

reasonable to assume that he would not have continued on but would have followed common towboat practice by backing up and straightening out his tow. Furthermore, the log of the St. Louis shows that the vessel made fair progress upstream and the only inference which can be drawn from this fact is that no difficulties were encountered in this stretch of the river. But apart from the probabilities and where as here the evidence is in hopeless conflict and cannot be reconciled in the light of any well established physical facts, the safest guide to follow that I know in determining the course of the vessel is to accept the testimony of the witness in whose hand rested the tiller. For these reasons, and there are others that need not be stated, I find as a matter of fact that the steamer St. Louis ran the ranges on the night of August 27, 1936, and that she experienced no difficulties with her tow. It follows that if libelants' deceased were where their witnesses placed them, they were not struck by the St. Louis or its tow because said vessel in passing this point was about 450 feet from the west bank.

The records of the Board of Commissioners of the Port of New Orleans show that no other large towboat and barges left New Orleans on the night in question, but the identity of the vessel which allegedly caused the damage has not been established by that character of evidence which may be regarded as satisfactory. It is not easy to comprehend the total inability of libelants' witnesses to describe the vessel and tow if they had the opportunities for observing its movements which they claim to have had. One of these witnesses had been fishing on the river for seven years and another for as long as twelve years and they must have been familiar with the various types of craft that ply the river, yet standing 40 feet away they were unable to describe what they saw other than it was a large towboat pushing a number of large barges. Having heretofore reached the conclusion on conflicting testimony that the collision did not occur close in to shore, there is little that remains to be said, for the conclusion reached plausibly explains the inability of libelants' witnesses to describe the vessel with any degree of particularity. There remains the possibility that the accident occurred further out in the river but even this possibility is removed if the testimony of Joe Wilson is accepted. Wilson was the only witness that testified to the time at which the accident occurred. He fixed the time at about 9:42 or 9:43 P. M. because seven or eight minutes before one Strader asked him for the time and he looked at his watch and it was then 9:50 P. M., which was of course more than an hour after the St. Louis passed this point.

But assuming that the identity of the vessel has been established and that its course was close in shore, the inherent weakness of libelants' case lies in the fact that no one witnessed the accident. Nor did anyone at or immediately preceding the time of the outcry see a light in the skiff. Admittedly the night was dark and if the light was not burning or visible, and the evidence supports that conclusion, then the collision did not result as a consequence of neglecting to keep a proper lookout. The place where this accident is alleged to have happened was not a well known fishing ground and there was no obligation on the part of the master to designate a member of the vessel's crew to act as a lookout. It has long been settled that the absence of a special lookout is not material where his presence would not have availed to prevent a collision.

There is no physical evidence in this case to support the charge that the steamer collided with the skiff. Though the noise from the impact was likened to that of a house falling down, no part of the skiff was ever discovered despite the fact that search therefor was immediately made. It is also a fact that the bodies of deceased bore no physical signs of injury. But assuming that the collision happened it was certainly the obligation of the skiff to get out of the way of the approaching steamer and the evidence shows that decedents had ample time to do so. They had every reason to expect the presence of other craft upon the river and should have foreseen the danger of a collision. They should therefore have exercised the utmost care for their safety. It was their duty to look and listen for approaching vessels and they are charged with the knowledge of what they might have discovered. The inference is that they did neither. Had they looked they would have seen the running lights and search light of the approaching steamer. Had they listened they would have heard the breaking of the water on the bow of

the boat and the noise of the turbine fans in the fire room. The pilot rules for western rivers provide that, "Rowing boats under oars shall have ready at hand a lantern showing a white light which shall be temporarily exhibited in sufficient time to prevent collision". While this rule according to its literal phraseology does not cover rowing boats or skiffs at anchor it does indicate a standard of care which the decedents should have but did not observe.

I find nothing in this case to charge the respondent with negligence. There was nothing that respondent should have done or omitted to do that would have saved decedent, Captain Stewart, from the consequences of his own negligence. On the other hand the decedent voluntarily placed himself in a place of danger and his negligence constitutes a complete bar to a recovery.

Decrees may accordingly be entered for the respondent dismissing the libels with costs.